UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

DAVID L. BRICKEY,                      )
                                       )
            Plaintiff,                 )
                                       )
      v.                               )   No. 4:11 CV 966 DDN
                                       )
                                       )
MICHAEL J. ASTRUE,                     )
Commissioner of Social Security,       )
                                       )
            Defendant.                 )

**MEMORANDUM**

This action is before the court for judicial review of the final decision of defendant Commissioner of Social Security denying the applications of plaintiff David L. Brickey for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 423, and for supplemental security income under Title XVI of that Act, 42 U.S.C. § 1382. The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons set forth below, the court affirms the decision of defendant Commissioner.

**I. BACKGROUND**

Plaintiff filed his applications on August 8, 2008, alleging a July 25, 2008 onset date and alleging disability due to the effects from heart attacks and a stroke. (Tr. 55, 109-15.) His claims were denied initially, on reconsideration, and after a hearing before an ALJ. (Tr. 53-60, 13-21, 26-52.) On April 22, 2011, the Appeals Council denied his request for review. (Tr. 2-5.) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

**II. MEDICAL HISTORY**

Plaintiff was born in 1957. He was admitted to St. John's Mercy Medical Center (St. John's) in Washington, Missouri, from December 10-12, 2007, after feeling dizzy and falling. He also had a left facial droop.

He had not seen a doctor in over twenty years. He was a pack-a-day smoker for 14 years. A chest x-ray showed mild cardiomegaly, or enlargement of the heart. A second chest x-ray showed some increase in his bronchovascular markings in his right lower lung. Minimal atelectasis, a complete or partial collapse of the lung, was also suspected. Plaintiff was discharged with a diagnosis of Transient Ischemic Attack (TIA) or ministroke, elevated blood pressure, and gastroesophageal reflux disease (GERD). An MRI did not show an acute stroke. His discharge medications were aspirin and Pepcid. (Tr. 53, 263-72.)

On December 14, 2007, following his hospitalization, plaintiff followed up with Gretchen Kluesner, M.D., his primary care provider. Dr. Kluesner ordered a daily aspirin regimen, as well as a CT scan to verify a questionable aneurysm. Dr. Kluesner prescribed hydrochlorothiazide for hypertension and continued the Pepcid. She ordered a stress test to rule out cardiac causes for his symptoms and instructed him to stop smoking, although plaintiff stated he was not ready to quit. Plaintiff's son called Dr. Kluesner's office on December 16, 2007, because plaintiff's blood pressure was elevated. Dr. Kluesner prescribed Lisinopril, in addition to the hydrochlorothiazide. (Tr. 327-29.)

On January 14, 2008, Dr. Kluesner noted plaintiff weighed 212 pounds and his blood pressure was 140/82. She noted that he still had left facial drooping with slurred speech that was unchanged since she last saw him. His stress test results were positive with continued chest pain, and he was scheduled for a heart catheterization. (Tr. 326.)

Following complaints of chest pains and exertional shortness of breath, on January 16, 2008, plaintiff was admitted to St. John's Mercy Hospital for a left heart catheterization by Brian Seeck, M.D., a cardiologist. Dr. Seeck diagnosed mild to moderate coronary artery disease and anomalous circumflex, a relatively common anatomical variation, which he was unsure was related to spasm or true disease. Dr. Seeck ordered a cardiac CT for further evaluation. (Tr. 274-75, 430.)

A coronary CT Angiography performed on January 22, 2008 showed anomalous circumflex of the right coronary artery; moderate stenosis of

the mid left anterior descending artery; and severe stenosis at the second diagonal artery. (Tr. 215.)

On January 24, 2008, plaintiff's sister called Dr. Kluesner's office because plaintiff had been short of breath since his catheterization. Dr. Kluesner prescribed Norvasc, a vasodilator used to treat hypertension and angina. She ordered a Spirometry, a test used to determine lung functioning, which showed moderate airway obstruction. On April 22, 2008, Dr. Kluesner increased plaintiff's Lisinopril, discontinued the Pepcid, and prescribed Prilosec for his GERD. (Tr. 237, 252, 325.)

On June 5, 2008, plaintiff was transported by ambulance to the ER at St. John's Hospital in Washington, Missouri, with reports of full body weakness. He was diagnosed with a cerebral vascular accident (CVA) or stroke, nonhemorrhagic, and was transferred to St. John's Hospital in St. Louis. Lee Tempel, M.D., opined that there was no evidence of current or past stroke, including his episode in December 2007. He opined that it was unlikely plaintiff had a stroke in December 2007, but rather experienced severe dizziness combined with facial asymmetry due to Horner syndrome, a condition on one side of the face involving a drooping eyelid, decreased pupil size, and decreased sweating.[1] Dr. Tempel spoke at length with plaintiff about quitting smoking. He was discharged June 9, 2008. (Tr. 217-27.)

On June 11, 2008, plaintiff saw Dr. Kluesner for follow up. Plaintiff had some residual right side weakness. Dr. Kluesner was "concerned about the amount of labor he does and with any kind of weakness and instability." She scheduled him for physical therapy (PT) and excused him from work for the next 30 days. He underwent outpatient PT from June 12 to July 8, 2008 to regain his strength following the cerebral event. On July 8, 2008, Dr. Kluesner released him to return to work. (Tr. 282-92, 323.)

From August 4-8, 2008, plaintiff was admitted to St. John's Hospital in Washington, Missouri, following a head-on motor vehicle accident. He was unconscious, with numerous contusions, facial lacerations, and

---

[1] See http://www.mayoclinic.com/health/horner-syndrome/DS01137 (last viewed on May 29, 2012).

hypoxemia or inadequate blood oxygen levels. His facial lacerations were repaired and he was transferred to the ICU. He developed pneumonia, and an antibiotic and steroid were started. Upon discharge James D. Jansen, M.D.'s diagnoses included right rib fracture and chest wall contusion, right pulmonary contusion, exacerbation of COPD, and facial lacerations and periorbital contusion. He was allowed to engage in activities as tolerated, but do no heavy lifting. He was discharged on a steroid, Levaquin, used to treat pneumonia; Percocet, for pain; aspirin; and Pepcid. Abnormal liver function tests upon admission had improved to normal by discharge. (Tr. 295-311, 398-99.)

On August 15, 2008, plaintiff saw Dr. Jansen for follow up. A chest x-ray showed a right eighth rib fracture along with borderline cardiomegaly or enlargement of the heart. Dr. Jansen prescribed Percocet and instructed him to follow up in ten days. (Tr. 393, 397.)

On August 22, 2008, plaintiff followed up with Dr. Kluesner after his motor vehicle accident. He reported that he was healing well but still needed pain medications. He stated that he had been in bed frequently over the past 7-10 days. Dr. Kluesner's review of systems was negative for chest pain, shortness of breath, coughing, or wheezing. He had some swelling in his left leg, and an ultrasound was ordered to rule out deep vein thrombosis. He also reported smoking 1½ packs of cigarettes a day for twenty years. (Tr. 318-19, 359, 470-72.)

On August 25, 2008, plaintiff saw Dr. Jansen for follow up. His chest was doing well, and a chest x-ray showed some infiltrate that Dr. Jansen did not feel was serious. He was eating and breathing "okay," but complained of some pain and swelling in the right knee and leg. He was scheduled for a venous ultrasound that day. Dr. Jansen allowed plaintiff to resume his activities as tolerated and released him to return to work. (Tr. 392.)

Plaintiff saw Dr. Jansen on September 8, 2008. He was doing better overall. He was not having leg pain, but was still having some right knee pain. He had better aeration to his lower lung bases. His cardiac exam was normal. His knee showed no significant swelling or instability. (Tr. 391, 396.)

In a Function Report dated October 18, 2008, plaintiff stated his

daily activities include bathing, straightening up his house, taking care of his dog, going for walks, visiting his sister, and preparing meals consisting of sandwiches and frozen meals. He has someone help him take care of his dog. He identified no problems with his personal care. (Tr. 171-72.) He reported doing laundry, cleaning, mowing his yard, and cooking. He reported that he wakes up three or four times per night having difficulty breathing. He reported that he watches more TV than normal because he does not have the strength to do much else, and he is always tired. (Tr. 170-77.)

Plaintiff saw Dr. Kluesner again on March 18, 2009 for high blood pressure, and chest and GERD pain. His blood pressure was elevated at 138/80. He stated that he had been admitted to the hospital the prior weekend for chest pain. At that time, all his medications were continued. Plaintiff had no health insurance at that time, and therefore declined blood work. He was encouraged to stop smoking. A March 18, 2009, stress test showed negative EKG with exercise, no chest pain, and no changes from the prior study, which had revealed a small area of mild ischemia or insufficient supply of blood to an organ. (Tr. 420, 467-68.)

On April 20, 2009, Dr. Seeck completed a Physical Residual Functional Capacity (RFC) Assessment. Dr. Seeck opined that plaintiff could sit six hours in an eight-hour workday, and that he could stand, walk, and work five hours in an eight-hour workday. He opined that plaintiff could lift up to ten pounds frequently, 11-50 pounds occasionally, and never lift more than 51 pounds. He could carry up to ten pounds frequently, and up to 100 pounds occasionally. Dr. Seeck opined that plaintiff had mild to moderate coronary artery disease, and experiences chest pains at times. "From a cardiac standpoint, [plaintiff] has no limitations unless he has chest pain while working." (Tr. 443.) Dr. Seeck rated plaintiff's pain as "mild" and rated the severity of his pain as mild to moderate. He opined that plaintiff did not have a medically determinable impairment that could be expected to produce pain. (Tr. 443-47.)

On July 15, 2009, plaintiff's blood pressure continued to fluctuate. He was still uninsured at that time. Dr. Kluesner increased his Metoprolol, used to treat high blood pressure. She prescribed

Simvastatin, used to treat high cholesterol, and continued his aspirin and Pepcid. (Tr. 464, 466.)

On August 21, 2009, plaintiff saw Dr. Kluesner for a decreased heart rate, occasional dizziness, and occasional chest pain. He asked for samples of inhalers for his COPD symptoms. Dr. Kluesner determined that his heart rate was bradycardic or slow, and prescribed Isordil, used to treat coronary artery disease. She decreased his metoprolol and provided him samples of inhalers. (Tr. 461-63.)

Plaintiff saw Dr. Kluesner on October 20, 2009, for blood work to check his hyperlipidemia. He reported being compliant with medications and stated he needed refills. He reported that he "sometimes" checked his blood pressure, and that it usually runs 150/100. He complained of increased shortness of breath and that he has to stop to catch his breath even with walking short distances. He reported smoking only 1-2 cigarettes per day, although his daughter indicated otherwise. He stated that although it would be difficult, he would try to quit smoking completely. Dr. Kluesner noted that he had no bone or joint symptoms or muscle pains. His diagnoses were atherosclerosis or hardening of the arteries, hyperlipidemia or high cholesterol, TIA, tobacco use disorder, aneurysm of artery of neck, hypertension, COPD, and esophageal reflux. His medications included inhalers, metoprolol, Benicar for high blood pressure, Simvastatin, Pepcid, aspirin, and Tylenol with codeine as needed. (Tr. 458-59.)

On November 16, 2009, plaintiff was treated by Michael Korenfeld, M.D., for a retinal tear. He underwent laser surgery to repair the tear the following day without complications. He was instructed to reduce his level of activity over the next two weeks. At a follow-up appointment on December 3, 2009, plaintiff reported seeing flashes of light, but it was mild and not constant. (Tr. 449-53.)

A CT scan of the head and neck on January 23, 2008 revealed a carotid artery aneurysm or pseudoaneurysm, also known as a false aneurysm, a hematoma that forms as the result of a leaking hole in an artery. (Tr. 216.)

**Testimony at the Hearing**

On December 9, 2009 a hearing was conducted before an ALJ. Plaintiff testified to the following. He was born May 22, 1957 and was 54 years old. He has nine years of formal education and never received his GED. He is 5 feet 9 inches tall and weighs 238 pounds. He last worked in July 2008 in a lumber yard. He has coronary artery disease and COPD. He suffers from hypertension, GERD, high cholesterol, numbness in his left leg, and arthritis in his right leg, resulting from his August 2008 car accident. He suffers from chest pain, shortness of breath, and other pain. (Tr. 31-34.)

He is divorced, single, and lives alone in a house. His rent is $300.00 per month, which his sister helps pay. He receives $200.00 per month in food stamps. He received special education in speech therapy while in school and reads and writes below average. He can do simple arithmetic. (Tr. 30-32.)

He smokes about 3 packs of cigarettes per week and is trying to quit. He does not use alcohol or illicit drugs. He does not drive and has never attempted to obtain a driver's licence. His last employer was close enough to his home that he was able to walk to work, about thirty minutes away. (Tr. 32-35.)

He has past work experience as a stacker in a lumber yard and as a laundry worker. His last employer was a lumber yard that made home trusses. He last worked in July 2008 when he first began feeling bad. The lightest job he ever held was operating a towel machine in a laundry factory. The position entailed putting towels on the towel machine, folding them, and stacking them in a cart. The job required that he move his arms and stand constantly during his shift. He could no longer do this job because he cannot stand for long periods of time and his legs would give out on him. His heart symptoms began suddenly while he was working at the lumber yard and began feeling very weak and was taken to the hospital. He has chest pains daily or every other day which last a couple of hours, and he must sit back and relax. Taking aspirin sometimes helps. He does not have the "get up and go" that he had before his heart issues, and it takes him at least five minutes to get out of bed. His blood pressure was under control. (Tr. 33-37, 45.)

He has COPD and uses inhalers. He has shortness of breath which prevents him from walking too quickly and doing other things. These symptoms began before his heart attack while he was working at the lumber yard. (Tr. 38.)

He has difficulty doing household chores and yard work. A neighbor mows his lawn. He can no longer move the furniture in his house and others help him with this. He uses a vacuum cleaner instead of a broom because it is easier, and washes his dishes only every other day. He must pick up objects with both hands when dusting otherwise he will drop them. (Tr. 35-40.)

His right knee still bothers him as a result of his August 2008 car accident. There is an area on his knee that stays numb that his doctors opine is arthritic. He uses a cane that his treating physician instructed him to use, and without the cane his legs will buckle and he will fall. He began using the cane a few months earlier. His sister paid for the cane because Medicaid would not. (Tr. 42-43, 49-50.)

John A. Grenfell, Vocational Expert (VE), testified that plaintiff's work history ranges from light to heavy with various Specific Vocational Preparation (SPV). His past jobs included: cook, medium with an SVP of 5; custodial worker, medium with an SVP of 3; laundry worker, light with an SVP of 2; and two stacker jobs, one medium with an SVP of 2, and the other heavy. (Tr. 46.)

The ALJ presented the VE with two hypotheticals. In the first, the ALJ referred to the Physical RFC assessment by Dr. Seeck. Under that RFC plaintiff could sit six hours in an eight-hour day, stand and walk five hours, but could only work five hours a day. The ALJ removed the limitation of working five hours a day, and asked the VE if based on the remaining limitations, plaintiff could do any of his past relevant work (PRW). The VE testified that plaintiff would be able to perform his past work. The VE stated that the RFC indicated plaintiff could occasionally lift up to 50 pounds and could occasionally carry up to 100 pounds. Therefore, he believed that the plaintiff could engage in medium work activity with these restrictions, and without any restrictions on grasping, pushing, pulling, and being able to use his feet for repetitive motion operating foot controls. The VE testified that plaintiff could

perform the medium jobs of stacker, custodian, and cook. He also stated that plaintiff could perform the light jobs of laundry worker and short order cook.

The second hypothetical included the same restrictions as the first, but added the use of a cane while walking. The VE testified that there would be a limited number of laundry jobs that plaintiff could perform because he would be required to stand in one place and move laundry. Plaintiff would not be able to perform the job of custodial worker, cook, or stacker, because they generally require the use of both upper extremities while walking. The ALJ added that one of plaintiff's hands would be holding the cane. The VE testified that with this restriction, plaintiff would not be able to work as a laundry worker. (Tr. 47-48.)

On cross-examination, the VE was asked to consider plaintiff's problem with his knees, including the numbing and tingling, and its effect on his ability to stand for long periods of time. Counsel asked the VE to assume that based on all of plaintiff's conditions, not merely those from his cardiologist's point of view, plaintiff was limited to standing two hours per day. The VE testified that with those limitations, all light work would be precluded. (Tr. 50.)

### III. DECISION OF THE ALJ

On April 14, 2010, the ALJ issued an unfavorable decision. The ALJ found that plaintiff had not engaged in substantial gainful activity since July 25, 2008, his alleged onset date. The ALJ found that plaintiff had the severe impairments of coronary artery disease and COPD. The ALJ found that he did not have an impairment or combination of impairments that met or medically equaled an impairment on the Commissioner's list of disabling impairments. The ALJ determined that plaintiff had the RFC to perform a wide range of light to medium work. He could stand and/or walk for up to five hours in an eight-hour workday, and sit for at least six hours in an eight-hour workday. He could lift/carry up to 10 pounds frequently, lift/carry 11-50 pounds occasionally, and could occasionally bend, squat, crawl, climb, reach overhead, stoop, crouch, and kneel. He could tolerate occasional exposure to unprotected heights, moving machinery, marked temperature

changes, dust, fumes, gases, and noise.  Based on the testimony of the VE, the ALJ determined that plaintiff was able to perform his PRW as a laundry worker; stacker, at a medium exertional level; custodian; and cook.  The ALJ therefore concluded plaintiff was not disabled under the Act.  (Tr. 13-21.)

## IV.  GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and is supported by substantial evidence in the record as a whole.  Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009).  "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion."  Id.  In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision.  Id.  As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently.  See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months.  42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); Pate-Fires, 564 F.3d 935, 942 (8th Cir. 2009).  A five-step regulatory framework is used to determine whether an individual qualifies for disability.  20 C.F.R. § 404.1520(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942 (same).

Steps One through Three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets or equals a listed impairment.  Pate-Fires, 564 F.3d at 942.  If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's

analysis proceeds to Steps Four and Five.  Id.  Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform his PRW.  Id.  The claimant bears the burden of demonstrating he is no longer able to return to his PRW.  Id.  If the Commissioner determines the claimant cannot return to his PRW, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work.  Id.

## V. DISCUSSION

Plaintiff contends that the ALJ erred (1) in failing to take into account the combined effects of all his impairments; (2) in failing to inquire about the intensity, persistence, and limiting effects of his symptoms in connection with his daily activities and his ability to do work activities; (3) in assessing his subjective complaints of pain; and (4) in determining his RFC.

Plaintiff first argues that the ALJ erred in failing to take into account the combined effects of all his impairments.  He specifically argues that his coronary artery disease, hypertension, GERD, high cholesterol, left-leg numbness, right-leg arthritis, and intermittent chest pain combine to make him unable to work.  This court disagrees. The ALJ's decision demonstrates that he considered each of these impairments in reaching his conclusion.

In determining whether an individual has severe impairments, the ALJ considers the combined effect of all of an individual's impairments, and then considers the combined impact of the impairments throughout the disability determination process.  See 20 C.F.R. §§ 404.1523, 416.923. The ALJ complied with this regulation.  The ALJ specifically found that plaintiff's "combination of impairments" did not meet or equal a listing, and then stated that he considered "all symptoms" in finding that plaintiff could perform his past work.  (Tr. 15-16.)  See Raney v. Barnhart, 396 F.3d 1007, 1011 (8th Cir. 2005) (express statement that an ALJ considered the combined impairments is sufficient to show that he complied with the regulation).

The ALJ discussed plaintiff's various impairments and hospitalizations at length in his decision.  (Tr. 15-20.)  The ALJ found

plaintiff's coronary artery disease and COPD severe. (Tr. 15.)  The ALJ noted that plaintiff testified that his hypertension and GERD were well controlled with medication.  (Tr. 17, 19, 40-41, 45, 265.)  See Medhaug v. Astrue, 578 F.3d 805, 813 (8th Cir. 2009)("An impairment that can be controlled or remedied by treatment is not considered disabling.").  The ALJ also discussed plaintiff's testimony with respect to his alleged impairments.  (Tr. 16.)

Plaintiff also points to a failed stress test.  However, plaintiff failed the stress test in 2007, even while he demonstrated good exercise tolerance.  A subsequent stress test taken March 18, 2009 showed negative EKG with exercise, no chest pain, and no changes from the prior study, which had revealed a small area of mild ischemia.  (Tr. 17, 326, 420, 432.) Dr. Seeck opined after the most recent stress test that plaintiff had no cardiac-related limitations.  (Tr. 443.)  The court concludes the ALJ's decision establishes that he considered each impairment in determining that plaintiff was not disabled.

Plaintiff also complains that the ALJ failed to inquire about the intensity, persistence, and limiting effects of his symptoms in connection with his daily activities and his ability to do work activities.  In his function report, plaintiff described his day as including straightening up his house, taking care of his dog, going for walks, and preparing simple meals.  He identified no problems with his personal care.  However, he reported difficulty doing laundry, cleaning, mowing his yard, and cooking.  (Tr. 170-72.)  At the hearing, plaintiff testified that he had difficulty doing laundry and cleaning.  (Tr. 39-40.)  In October 2009, Dr. Kluesner noted that plaintiff had no bone or joint symptoms or muscle pains, and she repeatedly assessed plaintiff in no acute distress.  (Tr. 324-26, 328, 458-59.)  See Casey v. Astrue, 503 F.3d 687, 696 (8th Cir. 2007) (ALJ may properly rely on inconsistencies between daily activities and allegations of disability in assessing plaintiff's credibility); see also Davis v. Apfel, 239 F.3d 962, 967 (8th Cir. 2001) ("Allegations of pain may be discredited by evidence of daily activities inconsistent with such allegations.")

Plaintiff argues that there is no evidence in the record that indicates that he can perform work on a sustained basis for eight hours

a day, five days a week. However, it is plaintiff's burden, not the Commissioner's, to show that a disabling condition exists that would preclude return to prior work. See Roth v. Shalala, 45 F.3d 279, 282 (8th Cir. 1995) (claimant bears burden of proving disability); see also Steed v. Astrue, 524 F.3d 872, 876 (8th Cir. 2008) (claimant's failure to provide medical evidence with this information, such as work-related restrictions, should not be held against the ALJ when there is medical evidence that supports the ALJ's decision). The court concludes that the ALJ properly considered plaintiff's daily activities as one factor in his analysis of plaintiff's credibility.

Plaintiff also contends that the ALJ improperly failed to credit his subjective complaints. The court disagrees. "The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts." Holmstrom v. Massanari, 270 F.3d 715, 721 (8th Cir. 2001). In assessing a claimant's credibility, the ALJ must consider: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of pain; (3) precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints. Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008); Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). "An ALJ who rejects [subjective] complaints must make an express credibility determination explaining the reasons for discrediting the complaints." Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000). The ALJ need not explicitly discuss each factor, however. Goff v. Barnhart, 421 F.3d 785, 791 (8th Cir. 2005). "It is sufficient if he acknowledges and considers [the] factors before discounting a claimant's subjective complaints." Id.

Here, the ALJ properly considered inconsistencies between plaintiff's subjective allegations and the objective medical evidence. Plaintiff's cardiologist, Dr. Seeck, did not opine as to limitations that would result in a finding of disability. (Tr. 443-47.) See Young v. Apfel, 221 F.3d 1065, 1069 (8th Cir. 2000)(lack of significant restrictions imposed by treating physicians supported ALJ's decision of no disability). Further, plaintiff's physical therapist, as well as Drs.

Jansen and Kluesner, released plaintiff to full activities and to work. (Tr. 282, 323, 392.) Cf. Moore v. Astrue, 572 F.3d 520, 524 (8th Cir. 2009)("A lack of functional restrictions on claimant's activities is inconsistent with a disability claim where, as here, the claimant's treating physicians are recommending increased physical exercise.")

Several inconsistencies in the record evidence also support the ALJ's conclusion that plaintiff was less than fully credible. See Eichelberger, 390 F.3d at 589 ("[A]n ALJ may disbelieve a claimant's subjective reports of pain because of inherent inconsistencies or other circumstances"). For example, plaintiff asserts that Dr. Kluesner prescribed him with a cane. However, Dr. Kluesner's records do not show that she ever prescribed him a cane. In fact, her most recent examination in October 2009 revealed no bone, joint, or muscle pain. (Tr. 458-59.) Dr. Kleusner's records also do not show a diagnosis of arthritis or other musculoskeletal problem in plaintiff's legs. The only issue Dr. Kleusner ever noted with respect to plaintiff's legs was some swelling during his August 22, 2008 appointment, approximately three weeks after his car accident. (Tr. 471.) During his September 8, 2008 appointment with Dr. Jensen, plaintiff's knee had no significant swelling or instability, and he reported that his legs were fine. (Tr. 17, 391.) Dr. Seeck opined that plaintiff had no medically determinable impairment that would produce pain. (Tr. 445.) See 20 C.F.R. §§ 404.1529(b), 416.929(b) ("Your symptoms, such as pain, fatigue, shortness of breath, weakness, or nervousness, will not be found to affect your ability to do basic work activities unless medical signs or laboratory findings show that a medically determinable impairment(s) is present.").

The ALJ also noted that plaintiff continued to smoke despite his COPD and repeated orders from his doctors to stop. (Tr. 19, 222-23, 325, 376, 383, 458, 467.) See Choate v. Barnhart, 457 F.3d 865, 872 (8th Cir. 2006) ("[A]n ALJ may properly consider the claimant's . . . failing to take prescription medications, seek treatment, and quit smoking."). Plaintiff sought almost no treatment for his alleged knee and leg pain, which also undercuts his assertions of disability. See e.g., Barrett v. Shalala, 38 F.3d 1019, 1023 (8th Cir. 1994) (failure to seek aggressive treatment is not suggestive of disabling back pain.) Additionally, as

noted earlier, record evidence demonstrates that medication controlled plaintiff's high blood pressure and GERD. Here, the ALJ properly evaluated plaintiff's credibility, including his combination of impairments, daily activities, and subjective complaints in finding that he was not disabled.

Plaintiff finally argues that the ALJ cannot deny a claim because of opportunities for work that are merely conceivable and not reasonably possible. Plaintiff takes issue with the ALJ's determination that plaintiff has the RFC to perform a wide range of light to medium work.

RFC is a medical question and the ALJ's determination of RFC must be supported by substantial evidence in the record as a whole. Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001); Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001); Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000). RFC is what a claimant can do despite his limitations, and it must be determined on the basis of all relevant evidence, including medical records, physicians' opinions, and a claimant's description of his limitations. Donahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001); 20 C.F.R. § 416.945(a). While the ALJ is not restricted to medical evidence alone in evaluating RFC, the ALJ is required to consider at least some evidence from a medical professional. Lauer, 245 F.3d at 704.

The ALJ's RFC is in part inconsistent with the limitations contained in Dr. Seeck's opinion and therefore does not support an RFC of medium work. The ALJ determined that plaintiff had the RFC to do light or medium work, with the additional restrictions discussed above. "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. §§ 404.1527, 416.927. Dr. Seeck opined that plaintiff could sit six hours in an eight-hour workday, and stand, walk, and work five hours in an eight-hour workday. He opined that plaintiff could lift up to ten pounds frequently, 11-50 pounds occasionally, and never lift more than 51 pounds. Plaintiff could carry up to ten pounds frequently, and up to 100 pounds occasionally. Because there is no evidence that plaintiff could lift up to 50 pounds frequently, the ALJ's RFC finding with respect to medium work is in error.

However, even assuming that the ALJ's analysis is incorrect with

respect to medium work, Dr. Seeck's Physical RFC assessment still supports an RFC determination for light work. "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds." 20 C.F.R. §§ 404.1567, 416.967. The VE testified that plaintiff's PRW as a laundry worker was classified as light. Thus, even under this more limited RFC, plaintiff could still perform his past work as a laundry worker. See Smith v. Astrue, No. 2:10-CV-2092, 2011 WL 1843194, AT *3 (W.D. Ark. May 16, 2011)(holding ALJ'S erroneous determination that claimant could perform past medium-level work did not require remand because ALJ also correctly determined that claimant could perform her past light-level work); see also Samons v. Astrue, 497 F.3d 813, 821 (8th Cir. 2007) ("We need not determine whether Ms. Samons was able to return to her other past relevant work since we have concluded that nothing in her RFC affects her ability to perform the work of a cashier."). Accordingly, the court concludes the ALJ's RFC as to light work was supported by the record evidence.

## VI. CONCLUSION

For the reasons set forth above, the court finds and concludes that the decision of the ALJ is supported by substantial evidence on the record as a whole and is consistent with the applicable law. The decision of the Commissioner of Social Security is affirmed. An appropriate Judgment Order is issued herewith.

                              /S/   David D. Noce
                            **UNITED STATES MAGISTRATE JUDGE**

Signed on May 29, 2012.